# STATEMENT OF PEDRO FLORES – JUNE 4, 2009

## I. Introduction

My name is Pedro Flores. I have testified before this grand jury on a number of occasions. I am giving this statement freely and voluntarily, pursuant to proffer letters with the United States Attorney's Offices for the Eastern District of Wisconsin and the Northern District of Illinois. I have read this statement carefully and have been given an opportunity to go over it with my attorney and to make changes. This statement is just a summary and does not contain every detail I remember about the drug trafficking activities in which I have participated. If asked additional questions, I could provide more detail. As with my previous statements and as I will discuss in greater detail later in this statement, although no promises have been made to me regarding my cooperation or the sentence I will ultimately receive, I am cooperating with the government in the hope of receiving a reduced sentence in a federal case where I have been indicted on federal narcotics charges.

As I have testified previously, since approximately 1998, my twin brother, Margarito Flores (who I will generally refer to in this statement as "Margarito"), and I have been responsible for the distribution of thousands of kilograms of cocaine in Chicago, Illinois and elsewhere. Margarito and I have acted as partners in the drug business, and while we each perform different roles, we are generally aware of each other's activities and we coordinate our business together. Throughout this statement, I will refer to our drug-trafficking organization as the "Flores DTO." In terms of our operation in Chicago, Illinois and the rest of the United States, I held the primary responsibility. Margarito was primarily responsible for coordinating the receipt of drugs from our sources of supply in Mexico. This statement will talk about our drug trafficking in general, but will focus primarily on our interactions with two of our primary sources of supply, Joaquin Guzman-Loera (who I know as "El Chapo" or "Chapo Guzman"), and members of his organization, and Ismael Zambada-Garcia (who I know as "el Mayo" or "Mayo Zambada"), and members of his organization.

### *A. Historical Summary of Narcotics Trafficking.*

In approximately 1998, Margarito and I started distributing cocaine in Chicago. By approximately 1999, Margarito and I had expanded our business and were selling wholesale quantities of cocaine to a large customer base throughout Chicago. From approximately 2000 through 2008, we steadily increased the volume of our business, which I will describe later in detail. From 2006 through 2008, we were coordinating, at its peak, the distribution in Chicago to our customer base of approximately 1500 to 2000 kilograms of cocaine per month. From approximately 2000 to 2007, our Mexican sources of supply primarily delivered cocaine to us in Chicago. Beginning in approximately late 2006, we expanded our business and began also receiving cocaine in Mexico and Los Angeles. When we received cocaine in places other than Chicago, this cocaine was generally transported in tractor trailers

P.F.

with hidden compartments, or "traps," located in the roof. These same trap compartments were used to transport money from the sale of the cocaine. In addition to these tractor trailers, we also used freight trains to transport cocaine. Although we had customers in several cities, most of the cocaine that Margarito and I distributed in the United States at one time passed through Chicago. From Chicago, we distributed the cocaine to our customers throughout the United States, although the majority of our major customers were in the Chicago area.

### *B. Move to Mexico*

In approximately late 2003, Margarito went to Mexico on vacation. Once he was there, he decided that it would be better to stay than go back to Chicago. In early 2004, I began to fear that I would soon be arrested on narcotics trafficking charges and I made a similar move to join Margarito in Mexico. Once I arrived in Mexico, Margarito helped me to get established as he had already been there for several months. Before I left Chicago, Margarito and I made arrangements to continue selling cocaine in the United States by setting up a drug distribution and money collection network allowing us to operate from Mexico. As Margarito and I continued to take delivery of and distribute cocaine, our organization continued to grow.

### *C. Summary of the Structure of the Flores DTO*

In running our narcotics trafficking business, we dealt, broadly speaking, with three groups of people. The first group was our sources of supply of cocaine and heroin in Mexico. These individuals obtained large quantities of cocaine, heroin, marijuana, and other narcotics in Mexico and we obtained large shipments of drugs from them that we in turn sold in the United States. The second group was our "workers" or "crew" in the United States, individuals who, at our direction, took delivery of large shipments of cocaine and heroin and distributed those drugs to our customer base, and in turn received, packaged and returned large amounts of money to us in Mexico. These individuals worked at our direction, and we paid them to provide these services to us. The third group was our wholesale customers in the United States. Margarito and I maintained approximately 30 large customers for cocaine and heroin in the United States in eight principal cities: Chicago, New York, Washington, D.C., Philadelphia, Cincinnati, Columbus, Detroit, and Los Angeles. We also had a large wholesale customer in Vancouver, Canada. When we took delivery of a load of cocaine, on almost all occasions we either took delivery in Chicago, or took delivery elsewhere in the United States and arranged to have the drugs transported to Chicago, where we distributed the drugs to our customers. We maintained several warehouses and "stash houses" in Chicago and other cities where our crew unloaded shipments of drugs for delivery to customers, and then in turn counted and packaged money from payments for those drugs. Generally, we made deposits of money to our Mexican sources of in supply in Chicago or Los Angeles for drugs that we received in the United States. I am aware that these deposits

P.F.

were then transported to Mexico, because in most instances, one of our workers would go to stash houses belonging to our sources of supply in Mexico to verify that the count of the money was correct. For drugs that we received in Mexico, we generally made money deposits in Mexico. Regardless of where we deposited the money, from my conversations with our sources of supply, I am aware that the money was ultimately transported to our Mexican sources of supply. I understood that all of the money deposited to our sources of supply that was collected from our customers and transported to Mexico was provided to our sources of supply in order to perpetuate our drug trafficking activities.

P.F.



### 2. *Alfredo and Mayra Last Name Unknown ("Alfredo" and*

In approximately 2005, I met a man who I know as Alfredo. I do not know Alfredo's last name. I was introduced to Alfredo by a man that I know as at a car dealership in Guadalajara. I do not know 's real name. works for Chapo as a bodyguard and also performs other tasks. When introduced me to Alfredo, Alfredo told me that he was a lifelong friend of Chapo's and was godfather to Chapo's son Alfredillo. Alfredo told me that he handled logistics for Chapo. Over time, I learned from Alfredo that he oversaw the transportation of cocaine for Chapo in several different ways. On behalf of Chapo, Alfredo organized the transportation of cocaine from Colombia to Mexico in airplanes; was involved in the transportation of cocaine from Colombia to Mexico in some sort of submarines used to evade law enforcement and the military when moving cocaine across the open ocean; and facilitated the transportation of cocaine in rail cars.

Shortly after I met Alfredo, I also met his wife . I believe that 's last name is the same as Alfredo's, however, I do not know what it is. I have been shown Exhibit #6, which is a photograph of . worked closely with her husband in transporting

P.F.

both cocaine and cocaine proceeds. Together with [REDACTED], Alfredo handled the logistics of transporting large shipments of bulk currency from drug proceeds, including the transportation of payments made to Chapo by his customers and payments made by Chapo to his sources of supply. In addition, Alfredo and [REDACTED] exchanged money from the currency of one nation to another.

In late 2006 or early 2007, Margarito and I entered into an agreement with Alfredo and his wife [REDACTED] to establish a series of companies that would allow us to more easily move cocaine throughout the United States. At this point, Margarito and I were moving almost all of the cocaine that we distributed in semi-trucks and trailers with trap compartments in the roof. While this system worked very well for us, we wanted to have a back-up plan or insurance policy to supplement the trucks. Alfredo had previously told Margarito and I that he was involved with a train company in the 1990's with a person that I knew as [REDACTED]. Due to Alfredo's prior experience in dealing with the trains, Margarito and I thought that he would be a good person to approach regarding our idea to branch out into train transportation. Margarito and I decided to invest approximately $600,000 with Alfredo and [REDACTED] to set up an importing business and a logistics company. We understood that the companies would be legitimate and would actually import and sell goods; however, the real purpose for these companies was to serve as a front that would allow us to transport cocaine by train.

Margarito and I told Alfredo that we were willing to invest money and wished to use the trains to transport our cocaine, but we did not want to be responsible for running the businesses, so we allowed Alfredo and [REDACTED] to decide what kind of companies to create. We later learned that they decided to established a furniture importation company. We agreed that, in addition to providing the $600,000 in start up money, that we would also pay Alfredo and [REDACTED] a fee each time we used the train. On average, we paid Alfredo and [REDACTED] approximately $1000 per kilogram of cocaine that we moved by train. While Margarito and I did not participate directly in making decisions for the businesses, Alfredo and [REDACTED] would occasionally ask us for our advice and would let us know what was going on with the companies. After the company was started we learned that Alfredo and [REDACTED] had hired a man they referred to as [REDACTED] I met this man several times, but I do not his name. Margarito and I also knew three brothers who participated in setting up the companies. The brothers' last name was [REDACTED]. While I met all three brothers at one point, I knew [REDACTED] the best. I have been shown Exhibit #7, which is a photograph of [REDACTED]. The [REDACTED] brothers were in charge of loading and unloading the trains at the warehouses near the train lines that Alfredo and [REDACTED] had set up. Once this operation was up and running, we began using it to transport cocaine from Los Angeles to Chicago in the walls of rail cars. The first load that we moved was in late 2007.

In approximately October or November 2008, Margarito and I arranged to have 200



kilograms of cocaine transported from Los Angeles to Chicago using the train system that we set up with Alfredo and [REDACTED]. On approximately November 3, 2008, Alfredo, [REDACTED] [REDACTED], and others came to visit Margarito and I at my house in Guadalajara. While Alfredo was at my house, we discussed many things, including the load of cocaine that we were currently moving with the train, one of the 747 airplanes that Chapo uses to transport cocaine, which Alfredo organized, and an impending load of cocaine Chapo was bringing from Colombia in a submarine that Alfredo, Margarito, and I had all invested in. I recorded this conversation by placing a digital recording device in my pocket. I have had the opportunity to listen the recordings contained on a CD labeled "Recorded Calls." I have initialed the exhibit sticker. On this CD are true and accurate copies of recordings that Margarito and I made, including a true and accurate recording of the conversation that Alfredo, [REDACTED], Margarito, and I had on approximately November 3, 2008. I am also aware that Margarito recorded a portion of this conversation as well on a cell phone.

At the time that Alfredo first came to my house, the only cocaine that I was aware was in transit in the train was the 200 kilograms belonging to Margarito and I. However, during our conversation, Alfredo informed me that he had placed an additional 76 kilograms of his own cocaine into the same train car. Alfredo told Margarito and me that he was running very short on money and asked if we would be willing to purchase these 76 kilograms. I told him that we would only purchase the cocaine if we could agree to a price that would allow Margarito and me to make enough of a profit from the cocaine to make it worth taking on the risk of the extra kilos. Alfredo asked Margarito and me what the wholesale value of cocaine was in Chicago. We told him that, at that time, it was between $30,000 and $30,500. Eventually, Margarito and I agreed to purchase the load of 76 kilos of cocaine for approximately $2,166,000, which worked out to $28,500 per kilo. Approximately one week later, the train carrying the cocaine arrived at Alfredo's warehouse in Chicago. I sent my workers to provide Alfredo's workers with a Nissan Murano in which to place the 200 kilos of cocaine that already belonged to Margarito and I, as well as the 76 kilos that we had agreed to purchase from Alfredo. Once the train arrived in Chicago, Alfredo's workers loaded the Murano and [REDACTED] called Margarito to tell him that the kilos were ready to be picked up. Margarito and I then called our worker Cesar Perez and told him to meet Alfredo's workers at a Mexican restaurant located near 159th Street. A short time later, I talked to Cesar, who confirmed that he picked up the 276 kilos.

During the same conversation on approximately November 3, Alfredo also explained to Margarito and me the specifics of how Chapo's airplane operation worked to transport cocaine from Central and South America to Mexico. This was not the first time that Alfredo talked to us about the airplane. Essentially, Alfredo explained that Chapo had multiple 747 aircraft that he used for this purpose. Alfredo explained that the 747s were cargo planes with no seats in the body of the aircraft. Chapo would arrange to have a shipment of clothing sent to Central or South America as part of a humanitarian aid project. Once the planes landed

P.F.

in Central or South America, the clothing was offloaded and up to 13 tons of cocaine was loaded onto the plane for the return trip to Mexico. The planes would land at Mexico City International Airport and Chapo would then use his contacts to have the cocaine offloaded from the planes and get the cocaine out of the airport. Alfredo explained specifically about the last few trips with the plane. Alfredo told us about occasions in which he organized for Chapo trips bringing back 1700, 7000, and 12,000 kilos of cocaine.

In addition to her involvement in the train companies, [redacted] also was involved in the transportation of bulk currency from Chicago or Los Angeles to Mexico. For a fee of approximately 3 to 7 percent of the money transported, [redacted] would guarantee that she would transport money safely from one location to another. From my conversations with [redacted], I know that she was aware that the money that she transported was proceeds from the sales of drugs and that [redacted] was transporting the money in order to perpetuate the drug conspiracy in which we were all involved. We moved money through [redacted]'s transportation system approximately dozens of times. The money that she transported on our behalf ranged from shipments of approximately $100,000 up to several millions dollars. [redacted] told me that she transported the money by both cars and planes. When large sums of money were being transported, [redacted] would use private planes to move the money.

P.F.

Among other methods, I am personally aware that Chapo, Mayo, and their organizations used 747 cargo planes to import ton-quantities of cocaine from Central and South America to Mexico. I am also aware that Chapo, Mayo, and their organizations used smaller airplanes, submarines, tractor trailers with trap compartments, container ships, fishing vessels, go-fast boats, buses, trains, and personal automobiles to transport cocaine, first from Central and South America to Mexico, and then from Mexico into the United States.

P.F.

## VI. Closing Remarks

In total, since 1998, Margarito and I were responsible for the distribution of thousands of kilograms of cocaine from Chicago and elsewhere, supplied to us by our sources of supply in Mexico. Other than the few shipments of cocaine and heroin that were seized by the authorities or stolen, all of this cocaine was distributed to our customers. In the spring of 2008, I realized that I would not be able to continue this kind of a life forever, I began the process of my cooperation and have been cooperating ever since. Although no promises have been made to me regarding my cooperation, I am cooperating in hopes of receiving a reduced sentence in a federal case where I have been indicted on federal narcotics charges. In addition, although I am not cooperating in exchange for any benefits received, the federal government has provided some assistance in relocating my family from Mexico to the United States. With some assistance from the DEA and U.S. Attorney's Office, Margarito and I moved our wives, our children, our brother and his wife and children, our two sisters and their children, our father, our mother, and the mother of two of my children. I knew that once the people I have talked about today found out I was cooperating, they would try to kill me and my family. As far as I know, nobody knows where my family is living and I am being kept in protective custody.

P.F.

This statement is an accurate and truthful summary to the best of my recollection. It does not describe everything that I know about the events described or other events that are not described.

Signed:

Pedro Flores

Pedro Flores

Dated: June 4, 2009