UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALFREDO VASQUEZ-HERNANDEZ | No. 09 CR 383-5<br><br>Judge Sharon Johnson Coleman |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S**
**MOTION FOR COMPASSIONATE RELEASE**

The United States of America, by John R. Lausch, Jr., United States Attorney for the Northern District of Illinois, respectfully submits the following response to defendant Alfredo Vasquez-Hernandez's motion for compassionate release. [Dkt. 862.] As explained below, because Vasquez-Hernandez has not established that a reduction of his sentence would be consistent with the applicable Guidelines policy statement and the factors set forth in 18 U.S.C. § 3553(a), his motion should be denied.

**Background**

**I.  Offense Conduct[1]**

Between May 2005 and December 2009, Vasquez-Hernandez was a member or associate of the notorious Sinaloa Cartel and, specifically, a member of a conspiracy to import into the United States and distribute massive quantities of cocaine. Vasquez-Hernandez's role in the conspiracy was to act as a logistical coordinator, responsible for the transportation of cocaine from Central and South America to Mexico, as well as from Mexico into and throughout the United States, for further distribution to customers in the United States, including in this District. Vasquez-Hernandez worked directly with multiple coconspirators, including Joaquin Guzman Loera (a/k/a "Chapo")

---

[1] This summary of Vasquez-Hernandez's offense conduct is derived from the government's sentencing memorandum filed on November 8, 2014. [*See* Dkt. 346.]

and brothers Pedro and Margarito Flores to smuggle cocaine from place to place using various modes of transportation, including airplanes and submarines used to transport cocaine into Mexico, and trains used to move cocaine across the U.S.-Mexico border and throughout the United States.

## II. Procedural History

### A. Indictment, Arrest, and Extradition

On January 5, 2012, the grand jury returned a Third Superseding Indictment charging Vasquez-Hernandez with conspiring to distribute controlled substances in violation of 21 U.S.C. § 846 (Count One), and conspiring to import a controlled substance into the United States, in violation of 21 U.S.C. § 963 (Count Two). Vasquez-Hernandez was arrested in Mexico in approximately January 2011. He was subsequently extradited to the United States and made his initial appearance in the Northern District of Illinois on October 5, 2012.[2] [*See* Dkt. 190.]

### B. Guilty Plea and Sentencing

On April 29, 2014, Vasquez-Hernandez pleaded guilty to Count One of the Third Superseding Indictment. [*See* Dkt. 314.] As reflected in a written plea declaration filed that day, Vasquez-Hernandez admitted that in November 2008 he arranged with two co-conspirators (the Flores brothers, discussed above) to transport approximately 276 kilograms of cocaine from Los Angeles to the Northern District of Illinois. [*See* Dkt. 315 (Plea Decl.); Dkt. 391 (Tr. of Plea Hr'g).]

Prior to sentencing, the government argued that Vasquez-Hernandez was responsible for importing vastly more cocaine than the 276 kilograms he admitted to in his plea declaration.

---

[2] Vasquez-Hernandez's matter was initially assigned to Judge Rubén Castillo, who presided over, among other things, the initial appearance, change of plea hearing, sentencing, and earlier motions for post-conviction relief. Vasquez-Hernandez's matter was re-assigned to this Court in October 2019. [Dkt. 788.]

2

Specifically, the government pointed to a recording in which Vasquez-Hernandez described the use of an airplane to transport approximately 20,000 kilograms of cocaine. [Dkt. 346 (Gov. Sent'g Memo.) at 3.] The government also noted that it had seized approximately 1,930 kilograms of cocaine during the pendency of the charged conspiracy, and that Vasquez-Hernandez would have been aware of the substantial quantities of cocaine distributed by the conspiracy considering his high-level role in the Cartel, and his and his wife's efforts to launder proceeds derived from Chapo's sale of cocaine. [*See id.* at 7.] In light of this and other evidence, the government urged the Court to apply enhancements for using an aircraft to import a controlled substance under USSG §2D1.1(b)(3); for possessing a firearm under §2D1.1(b)(1); and for serving as a leader or organizer in the conspiracy under §3B1.1. [*See id.* at 8–12.] The government requested that the Court impose a sentence within the guideline range which, if calculated with all of the enhancements sought by the government, would have been at least 30 years' imprisonment.

In response, Vasquez-Hernandez argued that the government lacked sufficient evidence tying to him to a quantity of drugs beyond the 276 kilograms he admitted to as part of his plea agreement [Dkt. 344 (Def. Sent'g Memo.) at 3–5]; disputed the applicability of the enhancements under §2D1.1(b)(3), §2D1.1(b)(1), and §3B1.1 [*id.* at 5–10]; and urged the Court to impose the statutory-minimum ten-year sentence [*id.* at 14].

At sentencing on November 24, 2014, the Court agreed with Vasquez-Hernandez that the evidence supplied by the government was insufficient to support a drug quantity beyond the 276 kilograms he had acknowledged in pleading guilty, and likewise inadequate to support the enhancements under §2D1.1(b)(3) (use of an airplane) and §2D1.1(b)(1) (possessing a firearm). [*See* Dkt 364 (Tr. of Sent'g Hr'g) at 10–11.] The Court agreed with the government that Vasquez-Hernandez qualified for a three-level manager/supervisor enhancement under §3B1.1, observing

3

that even considering "only" the "mere" 276 kilograms of cocaine for which Vasquez-Hernandez admitted responsibility, it would be "nonsensical to think that this is the defendant's inaugural voyage into cocaine trafficking." [*Id.* at 13.] The Court later expanded on this point:

> I cannot sit here, as a judge who's been on the bench for 20 years and who's been involved in the drug war for a good portion of my life, and think for one second, nor do I think any other Chicagoan could think for one second that this was the first time that you just happened to do this, that you just kind of got up out of bed and said, well, let me do a 276-kilogram transaction to Chicago today.

[Dkt. 364 at 24.]

As a result of these rulings, the Court calculated Vasquez-Hernandez's advisory guideline range as 188–235 months' imprisonment. [*Id.* at 11, 15–16.] The Court ultimately decided, however, to impose a term above this substantial guideline range, explaining that

> what I do hold against you in no uncertain terms is this shipment, this one-time shipment of 276 kilograms of cocaine to the City of Chicago, because I tell you and I tell you this on behalf of all Chicagoans, on behalf of all the citizens of this country, we are tired, tired of drug trafficking, and it continues to hurt this city and this country. . . . And so the message that I would like to send back to the country of Mexico is this: If you involve yourself in a drug transaction like this, then the sentence, the only appropriate sentence for you, is going to be 25 years.

[*Id.* at 25.] In light of the time Vasquez-Hernandez had spent in custody in Mexico before his extradition to the United States, the Court agreed to impose a term somewhat below 25 years (and considerably below the government's initial 30-year recommendation), ultimately sentencing Vasquez-Hernandez to 22 years, or 264 months. [*Id.* at 25–26; Dkt 356 (Judgment).] The sentence was affirmed on appeal. *See United States v. Vasquez-Hernandez*, 834 F.3d 852 (7th Cir. 2016).

### C.     Post-Conviction Motions

On February 16, 2016, Vasquez-Hernandez filed a *pro se* motion for a reduction of sentence under 18 U.S.C. § 3582(c), based on Amendment 782 to the Sentencing Guidelines, which lowered the base offense levels for certain drug quantities listed in USSG §2D1.1(c). [*See*

4

Dkt. 458.] The Court denied the motion in an order entered on February 13, 2017, concluding that, because the Court had applied the 2014 Guidelines during the initial sentencing, Vasquez-Hernandez had "already received the benefit" of the changes made applicable through Amendment 782. [*See* Dkt. 501.]

On April 12, 2018, Vasquez-Hernandez filed a counseled petition under 28 U.S.C. § 2255 arguing that his decision to plead guilty had been involuntary as a result of ineffective assistance from his prior counsel. [*See* No. 18 CV 2620, Dkt. 2.] The Court denied Vasquez-Hernandez's motion in an order entered on November 1, 2018. [*See* No. 18 CV 2620, Dkt. 17.] The Court concluded, among other things, that Vasquez-Hernandez's statements during his plea colloquy refuted the claims in his petition that he had pleaded guilty as a result of overbearing pressure from his attorneys, that his attorneys were not ineffective for recommending that he plead guilty, and that Vasquez-Hernandez could not establish that the decision to plead guilty rather than go to trial prejudiced him. [*Id.* at 13–23.]

### III. Vasquez-Hernandez's Instant Motion for Compassionate Release

#### A. Vasquez-Hernandez's Expected Remaining Sentence and Status of COVID-19 Cases at his Present Facility

Vasquez-Hernandez has been in U.S. custody since approximately October 2012.[3] According to the U.S. Bureau of Prisons ("BOP"), Vasquez-Hernandez's projected release date is

---

[3] As noted above, Vasquez-Hernandez was arrested in Mexico in approximately January 2011 and held in custody in that country until he was extradited to the United States. At sentencing, the Court explicitly credited Vasquez-Hernandez for his time in Mexican custody. [*See* Dkt. 364 at 28–29 ("[T]his 22-year sentence expressly considers that period of time that Mr. Vasquez-Hernandez was in prison. In fact, but for him being in prison that period of time, I would have sentenced him today to a 300-month sentence, which would have been 25 years exactly.").]

October 5, 2029,[4] meaning that he has served slightly more than 50% of his expected sentence, and he has about 8.5 years left until his expected release. Vasquez-Hernandez is currently being held at the North Lake Correctional Facility ("CI North Lake") in Baldwin, Michigan.[5] According to BOP, since the beginning of the COVID-19 outbreak, CI North Lake has had 123 inmates test positive for COVID-19; of these, two inmates have died and no inmates at the facility are currently positive for the virus.[6]

### B. Vasquez-Hernandez's Administrative Request for Reduction of Sentence

On approximately October 21, 2020, Vasquez-Hernandez submitted an administrative request for compassionate release or a reduction in sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A). [*See* Dkt. 862, Ex. A.] In support of his request, Vasquez-Hernandez contended that he had various medical conditions, including Type II diabetes and obesity, that placed him at heightened risk from COVID-19.[7] On or about November 4, 2020, the Facility Administrator for CI North Lake denied Vasquez-Hernandez's request. [*Id.*]

On approximately February 17, 2021, Vasquez-Hernandez filed with this Court a pro se motion for a reduction of his sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A). [Dkt. 862.] In the motion, Vasquez-Hernandez argued that he has an extraordinary and compelling reason to be released, namely that his diabetes and obesity placed him at an increased risk of death resulting

---

[4] *See* https://www.bop.gov/inmateloc/ (last accessed Mar. 22, 2021).

[5] *See* https://www.bop.gov/locations/ci/nlk/ (last accessed Mar. 22, 2021).

[6] https://www.bop.gov/coronavirus/ (last accessed Mar. 22, 2021).

[7] Vasquez-Hernandez's medical records confirm that he has been diagnosed with Type II diabetes mellitus and, based on his body mass index ("BMI"), qualifies as obese. [*See* Dkt. 862, Ex. B.] According to the Centers for Disease Control ("CDC"), individuals with these conditions are at increased risk of severe illness from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Mar. 22, 2021).

from COVID-19, and that the conditions of confinement at CI North Lake increased the likelihood that he would contract COVID-19. [*Id.* at 9, 16–19.] Vasquez-Hernandez acknowledged that he had a pending immigration detainer and would likely be deported to Mexico upon release; alternatively, he asked to be released to finish his prison sentence on home confinement at his daughter's residence in California. [*Id.* at 16, 25–27.]

IV.     **BOP's Response to COVID-19**

As reported on its website, in January 2020, BOP began a course of action to respond to the spread of COVID-19.[8] Phase One of this course of action included the creation of an agency task force working in conjunction with subject matter experts from the CDC to review guidance about best practices to mitigate transmission. In March 2020, as part of Phase Two of the course of action, BOP began implementing various measures to mitigate the spread of the virus. These measures included suspending social visits, in-person legal visits, inmate movement, and staff travel. The BOP also began implementing procedures to quarantine and screen inmates and staff for the virus, which included screening all newly arriving inmates for exposure risk factors and symptoms, quarantining asymptomatic inmates with exposure risk factors, and isolating and testing symptomatic inmates with exposure risk factors.

Subsequent phases of BOP's response included the authorization of inmate movement in order to avoid overcrowding at BOP facilities. However, such movements were limited to inmates who had been in custody for more than fourteen days and who had been subjected to exit screening to ensure that the prisoner had no COVID-19 symptoms (fever, cough, shortness of breath) and a

---

[8] *See* Federal Bureau of Prisons COVID-19 Action Plan, March 13, 2020, https://www.bop.gov/ resources/news/20200313_covid-19.jsp (last accessed Mar. 22, 2021).

temperature less than 100.4 F.[9]  Subsequent phases of the course of action included: quarantining and isolating all new inmates, with asymptomatic inmates being quarantined for fourteen days and symptomatic inmates being isolated until testing negative for COVID-19; modifying operations to maximize social distancing; maximizing telework for staff members; and conducting inventory reviews of all cleaning and medical supplies to ensure ample supplies were on hand and ready to be distributed as necessary at BOP facilities.[10]

On April 1, 2020, as part of Phase 5 of its COVID-19 action plan, BOP secured all inmates to their assigned cells or quarters to decrease the spread of the virus.[11]  On April 13, 2020, as part of Phase 6 of its COVID-19 action plan, BOP continued to secure all inmates to their assigned cells or quarters to decrease the spread of the virus.[12]  Thereafter, on May 18, 2020, BOP extended the implementation of Phase 7 of its COVID-19 plan until June 30, 2020.[13]  Phase 7 extends all measures from Phase 6, including measures to contain movement and decrease the spread of the virus.

On August 5, 2020, BOP announced Phase 9 of its COVID-19 plan, which extended its previous safety measures through and including August 31, 2020.[14]  On September 2, 2020, BOP announced that non-contact, socially distanced in-person social visitations would re-commence at

---

[9] *See* Updates to BOP COVID-19 Action Plan, March 19, 2020, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last accessed Mar. 22, 2021).

[10] *See* Bureau of Prisons Update on COVID-19, March 24, 2020, https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (last accessed Mar. 22, 2021).

[11] *See* COVID-19 Action Plan: Phase Five, March 31, 2020, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last accessed Mar. 22, 2021).

[12] *See* COVID-19 Action Plan: Phase Six, April 13, 2020, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last accessed Mar. 22, 2021).

[13] *See* Bureau of Prisons COVID-19 Action Plan: Phase Seven, May 20 2020, https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp (last accessed Mar. 22, 2021).

[14] *See* Federal Bureau of Prisons, "Coronavirus (COVID-19) Phase Nine Action Plan," August 5, 2020, https://prisonology.com/wp-content/uploads/2020/08/COVID-19-Phase-9-COVID-Action-Plan.pdf (last accessed Mar. 22, 2021).

certain BOP facilities.[15] Phase 9 continues to be in effect, with modifications updated on November 25, 2020, including the continuation of non-contact, socially distanced in-person visitations, where possible while maintaining the safety of our staff, inmates, visitors, and communities.[16]

Recently, BOP began administering vaccines to inmates. On January 4, 2021, BOP issued updated COVID-19 Vaccine Guidance. The guidance states it is intended to "provide direction on use of the COVID-19 vaccine for all adults who meet the criteria established by [BOP], with guidance from the Advisory Committee on Immunization Practices (ACIP) and the [CDC]. . . . The goal of this guidance is to promote vaccine use as a means of controlling pandemic transmission of SARS-CoV-2 (the virus that causes COVID-19) and reducing morbidity and mortality from this infection."[17]

**Argument**

Vasquez-Hernandez seeks release pursuant to § 3582(c)(1)(A), which provides that where a defendant has exhausted his administrative remedies, the Court may reduce the defendant's term of imprisonment if the Court, "after considering the factors set forth in section 3553(a)," finds that "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." As discussed in greater detail below, the government agrees that Vasquez-Hernandez has complied with § 3582(c)(1)(A)'s exhaustion requirement and that he has demonstrated that extraordinary and compelling reasons warrant a sentence reduction. Nonetheless, particularly in light the seriousness

---

[15] *See* Bureau to Resume Social Visitation, September 30, 2020, https://www.bop.gov/resources/news/20200902_visitation.jsp (last accessed Mar. 22, 2021).
[16] *See* BOP Modified Operations, Updated November 25, 2020, https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed Mar. 22, 2021).
[17] *See* D-19 Vaccine Guidance, January 4, 2021, https://www.bop.gov/resources/pdfs/021_covid19_ vaccine.pdf (last accessed Mar. 22, 2021).

9

of Vasquez-Hernandez's offense conduct and the need to send a "strong message" with the sentence in this case—neither of which have changed since Vasquez-Hernandez was sentenced in 2014—the government submits that the requested reduction is not warranted in light of the factors set forth in § 3553(a).

I. **Legal Standard**

As amended by Section 603(b) of the First Step Act of 2018, Pub. L. 115-391, Title 18, United States Code, Section 3582(c)(1)(A) provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Direct of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Pursuant to Congress's directive, prior to the enactment of the First Step Act, the Sentencing Commission promulgated USSG §1B1.13, which, consistent with § 3582(c)(1)(A), provides that a court may reduce a term of imprisonment, after considering the § 3553(a) factors, if three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "[t]he defendant is not a danger to the safety of any other person or to the community, as

provided in 18 U.S.C. § 3142(g)"; and (3) the reduction is consistent with the policy statement, including the factors set forth in 18 U.S.C. § 3553(a), to the extent applicable.

Thus, in order to obtain relief under § 3582(c)(1)(A), a defendant must show that:

(1) he has requested relief from the BOP and exhausted any administrative appeals in that process;

(2) there exist extraordinary and compelling reasons that warrant a sentence reduction;

(3) the requested reduction is consistent with the policy statements issued by the sentencing commission in Guideline §1B1.13, including the requirement that "the defendant is not a danger to the safety of any other person or to the community"; and

(4) the reduction is warranted in light of the factors listed in 18 U.S.C. § 3553.

## II.     Vasquez-Hernandez Has Complied With § 3582(c)(1)(A)'s Exhaustion Requirement.

As indicated above, under § 3582(c)(1), a defendant is free to bring a motion for compassionate release after he has exhausted all administrative rights to appeal BOP's failure to bring a motion on his behalf, or 30 days have elapsed since the receipt of such a request by the warden of the defendant's facility, whichever is earlier.

On or about October 21, 2020, Vasquez-Hernandez submitted an administrative request for a reduction of sentence based on claims related to COVID-19 to the Facility Administrator for CI North Lake, where Vasquez-Hernandez is housed. [*See* Dkt. 862, Ex. A.] Vasquez-Hernandez's request was denied on November 4, 2020. [*See id.*] Because more than 30 days have elapsed since Vasquez-Hernandez's request was received by the facility administrator, he has exhausted his administrative remedies as required by §3582(c)(1).

11

### III. Vasquez-Hernandez Has Established Extraordinary and Compelling Reasons Warranting Consideration of a Sentence Reduction.

As Congress expressly directed,[18] the Sentencing Commission issued policy statements defining the "extraordinary and compelling reasons" that might warrant a sentence reduction under § 3582(c)(1)(A)(i). The circumstances identified by the Commission include instances in which a defendant suffers from a physical or mental condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." §1B1.13, comment. (n.1(A)(ii)).

Vasquez-Hernandez argues that he has demonstrated "extraordinary and compelling reasons" based on the COVID-19 pandemic and a number of his medical conditions, including his obesity and his Type II diabetes. [Dkt. 862 at 8–10.] As noted above, Vasquez-Hernandez's medical records confirm that he suffers from these conditions, which, according to the CDC, increase the risk of severe illness from COVID-19. For this reason, the government agrees that Vasquez-Hernandez has established that, in light of the pandemic, he suffers a serious physical or medical condition from which he is not likely to recover "that substantially diminishes the ability of the inmate to provide self-care within the environment of a correctional facility," *see* §1B1.13 comment. (n.1(A)(ii)(I)), in that Vasquez-Hernandez's conditions substantially diminish his ability to provide self-care against serious injury or death as a result of COVID-19, within the

---

[18] *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").

environment of a correctional facility. Accordingly, Vasquez-Hernandez has established an extraordinary and compelling reason for release.

### IV. Vasquez-Hernandez Release Would Not Be Consistent with the Sentencing Commission's Policy Statement or the Factors listed in 18 U.S.C. § 3553(a).

Although Vasquez-Hernandez may have established the existence of extraordinary and compelling reasons warranting consideration of a sentence reduction, this fact does not complete the relevant inquiry. The Court must also consider whether Vasquez-Hernandez poses a danger to the community and whether his release would be consistent with the factors set forth in 18 U.S.C. § 3553(a), including, most relevant here, the nature and circumstances of Vasquez-Hernandez's offense, and the need for the sentence imposed to reflect the seriousness of the offense and afford adequate deterrence to criminal conduct. On balance, these factors demonstrate that early release is not warranted.

Vasquez-Hernandez's offense conduct was extremely serious, involving high-level drug trafficking on behalf of the Sinaloa Cartel that pumped tons of drugs onto the streets of Chicago and elsewhere in the United States—drugs that unquestionably fueled violence in this city and undoubtedly had a devastating impact on an incalculable number of people. Vasquez-Hernandez contends that his "crimes of conviction did not involve . . . violence as alleged in the indictment" [Dkt. 862 at 21], and he is correct that, as the Court remarked at sentencing, "[t]here's no evidence that you ever held a weapon or ordered somebody else to hold a weapon or do anything with a weapon," [Dkt. 364 at 25]. At the same time, however, Vasquez-Hernandez pleaded guilty to participating in a conspiracy which, as alleged in the Third Superseding Indictment, sought to protect its narcotics distribution activities through violence and threats of violence against rival cartels as well as law enforcement.

While the sentencing court may have held that Vasquez-Hernandez was "only" responsible for the "mere" 276 kilograms of cocaine that he admitted to in pleading guilty, even that quantity alone represents a remarkable amount of narcotics. Moreover, the sentencing court correctly observed that it would be "nonsensical to think that" the 276-kilogram transaction represented "defendant's inaugural voyage into cocaine trafficking." [Dkt. 364 at 13.] That observation was particularly appropriate given Vasquez-Hernandez's rank as a leader within a transnational drug cartel as sophisticated as the Sinaloa Cartel.

In light of the damage done to "this city and this country" by even a one-time shipment of 276 kilograms of cocaine, and in order to send "a strong message" to others who would "involve [themselves] in a drug transaction like this," the sentencing court concluded that "the only appropriate sentence" was 25 years' imprisonment. [*Id.* at 25.] The "strong message" the sentencing court intended to send six years ago would be especially diluted in this case because Vasquez-Hernandez will almost certainly be deported shortly after his release from BOP custody, meaning that he will return as a free man to Mexico, powerfully communicating to would-be drug-traffickers there that, despite Vasquez-Hernandez's arguments to the contrary, "racketeering crime[ ] *does* pay." [Dkt. 862 at 25 (emphasis added).]

While the government does not dispute that Vasquez-Hernandez's diabetes and obesity put him at elevated risk of severe illness from COVID-19, the government respectfully submits that these conditions and risks do not offset the seriousness of Vasquez-Hernandez's offense conduct here and the anti-deterrent message that would be sent by releasing a major drug trafficker halfway through a 22-year sentence. This is particularly the case because the available records indicate that Vasquez-Hernandez is receiving appropriate medical care, and the available data suggest that efforts to limit and control the virus at CI North Lake—combined with the ongoing rollout of

14

vaccines—are having a positive impact. With respect to Vasquez-Hernandez's individual health, he has not claimed—and his medical records do not suggest—that medical personnel at the jail are failing to provide him with appropriate medical care. Further, though Vasquez-Hernandez contends (without support) that CI North Lake "has not demonstrated that it is equipped" to provide him with effective medical care [Dkt. 862 at 25], the available data indicates that the facility (which has capacity for 1,800[19]) has reported 123 positive inmates and two inmate deaths, with zero currently positive inmates. Further, Vasquez-Hernandez does not appear to claim that he has been exposed to individuals who have tested positive for COVID-19 or exhibited COVID-19 symptoms, suggesting that any outbreak at the facility has been brought under control.

## CONCLUSION

For the reasons stated above, the government respectfully submits that defendant Alfredo Vasquez-Hernandez's motion for compassionate release should be denied.


Dated: March 23, 2021  Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:
/s/ *Christopher Catizone*
CHRISTOPHER CATIZONE
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

---

[19] *See* https://www.geogroup.com/FacilityDetail/FacilityID/266 (last accessed Mar. 22, 2021).